UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Jeffrey Michael Davis,<br><br>    Debtor. | Case No. 18bk04521<br><br>Chapter 7 |
| Jeffrey Michael Davis,<br><br>    Plaintiff,<br><br>v.<br><br>Conduent, National Student Loan Program, Conduit, Amer[ican] St[u]d[e]nt Ass[is]t[a]nce, AccessLex Institute d/b/a Access Group[] Inc[.], Dept of ED/Fedloan Servicing (PHEAA), US Dept of Education, AES/PHEAA, Citibank (New York State) SLC, US Bank ELT Graduate Leverage, Brazos Loan Servicing, PNC Bank,<br><br>    Defendants. | Adversary No. 18ap00185<br><br>Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION[1]

Before the court is the Second Amended Adversary Complaint to Determine the Dischargeability of Certain Debts [Adv. Dkt. No. 47][2] (the "Complaint"), filed by the plaintiff-debtor, Jeffrey Michael Davis (the "Plaintiff"), seeking a determination that his outstanding student loan obligations to multiple entities, including the United States Department of Education (the

---

[1] This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, individually, "Bankruptcy Rule"). A separate judgment order will be entered pursuant to Bankruptcy Rule 9021.

[2] References to docket entries in the Adversary will be noted as "Adv. Dkt. No. ___." References to docket entries in the underlying bankruptcy case, *In re Jeffery Michael Davis*, Case No. 18bk04521 (Bankr. N.D. Ill. filed February 20, 2018) (Barnes, J.) (the "Main Case"), will be noted as "Dkt. No. ___."

"Department of Education"), Educational Credit Management Corporation ("ECMC")[3] and AccessLex Institute d/b/a Access Group ("Access" and collectively with the Department of Education and ECMC, the "Answering Defendants")[4] are dischargeable under section 523(a)(8) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). For the reasons stated herein, the Plaintiff failed to meet his burden to demonstrate that the repayment of his student loan debt would constitute an undue hardship under section 523(a)(8). Accordingly, the court, finding no just reason for delay, declines the Plaintiff's request to include his student loan obligations to the Answering Defendants in his discharge.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy judge may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Instead, the bankruptcy judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, the bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy judge hearing and determining the matter. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (parties

---

[3] ECMC was granted leave to intervene in this matter as a proper party defendant as guarantor of two student loans backed by the federal government. Order Granting Educational Credit Management Corporation Leave to Intervene [Adv. Dkt. No. 24].

[4] The Complaint contains two counts, each seeking a determination of dischargeability of certain debts. Count I seeks to include in the discharge the Debtor's outstanding debt to PNC Bank. Compl., at pp. 2–3. Count II seeks to discharge the remaining presumptively nondischargeable debt held by all other defendants, and such defendants include, but are not limited to, the Answering Defendants. *Id.*, at pp. 3–5.

may consent expressly or impliedly to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The Complaint is based on section 523(a)(8) of the Bankruptcy Code, which provides an exception to discharge for student loan obligations subject to a showing of undue hardship by the debtor. 11 U.S.C. § 523(a)(8). This adversary proceeding, concerning the dischargeability of a particular debt, is therefore expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Further, in accordance with *Stern*, 564 U.S. at 499, the bankruptcy court has constitutional authority to decide matters of nondischargeability, as the debtor's discharge and the dischargeability of a particular debt necessarily stem from the bankruptcy itself. *Parkway Bank & Tr. v. Casali (In re Casali)*, 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.) ("A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability."); *see also Bd. of Educ. of City of Chi. v. Monarrez (In re Monarrez)*, 588 B.R. 838, 845 (Bankr. N.D. Ill. 2018) (Barnes, J.). Each of the parties has also, in the Joint Pretrial Statement [Adv. Dkt. No. 66] (the "Joint Pretrial Statement"), expressly consented to the bankruptcy court's jurisdiction in this matter. *See* Joint Pretrial Stmt., at p. 2, ¶ 1.

As a result, the court has jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on this matter.

## PROCEDURAL HISTORY AND EVIDENTIARY RULINGS

The court has considered the evidence and arguments presented by the parties at the trial, which took place in this court on September 10, 2019 (the "Trial"), has reviewed the transcript of the Trial, dated September 10, 2019 [Adv. Dkt. No. 71] ("Tr."),[5] has reviewed the Complaint and has reviewed each of the following:

(1) Answer to Second Amended Adversary Complaint to Determine the Dischargeability of Certain Debts [Adv. Dkt. No. 48];

(2) AccessLex Institute d/b/a Access Group's Answer to the Second Amended Complaint [Adv. Dkt. No. 49];

(3) Answer to Second Amended Adversary Complaint [Adv. Dkt. No. 56];

(4) Final Pretrial Order Governing Second Amended Complaint to Determine the Dischargeability of Certain Debts [Adv. Dkt. No. 61] (the "Pretrial Order");

(5) Defendant AccessLex Institute d/b/a Access Group's Pretrial Brief [Adv. Dkt. No. 64];

(6) Pretrial Brief of United States Department of Education [Adv. Dkt. No. 65];

(7) Joint Pretrial Statement;

---

[5] The Transcript erroneously captions the proceeding addressed by this Memorandum Decision as "Jeffrey Michael Davis v. PHEAA, et al."

3

(8) Trial Brief of Defendant, Educational Credit Management Corporation [Adv. Dkt. No. 67]; and

(9) Plaintiff's Pretrial Brief [Adv. Dkt. No. 68].

The court has also considered the procedural history and previous court filings in the Main Case, including:

(a) Voluntary Petition [Dkt. No. 1] (the "Petition");

(b) Schedules A/B, C, D, E/F, G, H, I and J [Dkt. No. 9] (the "Schedules"); and

(c) Order of Discharge [Dkt. No. 17] (the "Discharge Order").

The court has also taken into consideration all exhibits submitted with or in conjunction with the above and, as the above is not an exhaustive list of the filings submitted in this adversary proceeding, the court has taken judicial notice of the contents of the dockets in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

The Pretrial Order entered in this matter required the parties to file a pretrial statement with a list of witnesses and a list of exhibits that such party planned to offer into evidence at the Trial. Pretrial Order, at p. 1. The Pretrial Order also allowed each party to file objections to an opposing party's pretrial statement, with such objections, if any, to include objections to the opposing party's witnesses and exhibits in lieu of any motion *in limine* that the party wished to bring. *Id.* at pp. 1–2. The Pretrial Order stated that all exhibits to which no objections were raised in the pretrial statements would be admitted into evidence. *Id.* at p. 2 Under the express terms of the Pretrial Order, the failure to file an objection would result in the waiver of any pretrial or evidentiary objections that could have been raised by such deadline. *Id.* at pp. 1–2.

The Answering Defendants objected to Plaintiff's Exhibit Nos. 1 and 5 in the Joint Pretrial Statement. Joint Pretrial Stmt., at p. 6. These objections are moot, however, as neither party used or otherwise referenced these exhibits at the Trial and therefore, their relevance has not been demonstrated. As such, Plaintiff's Exhibit Nos. 1 and 5 are therefore afforded no weight and are not discussed in this Memorandum Decision.[6]

---

[6] While the Pretrial Order stated that all exhibits to which no objections were raised in the pretrial statements would be admitted into evidence, the court further stated at the Trial that any admitted exhibit that was not used or otherwise referenced during the course of the Trial would be assigned a weight of zero. Tr. at pp. 5–6. In addition to Plaintiff's Exhibit Nos. 1 and 5, Plaintiff's Exhibit No. 7 was also not used or referenced by either party during the Trial. Without its relevance demonstrated to the court, Plaintiff's Exhibit No. 7 is also afforded no weight and is not discussed in this Memorandum Decision.

FINDINGS OF FACT[7]

From the above review and the consideration of the procedural background, as well as of the evidence presented at the Trial, the court determines the salient facts to be and so finds as follows:

A.  The Plaintiff

1. The Plaintiff is a 41-year-old male domiciled in Chicago, IL. Tr. at pp. 62–63.

2. The Plaintiff has a six-month-old daughter. *Id.* at p. 34. The Plaintiff testified that his daughter resides with her mother, Kelly Palmer ("Palmer"), who is also the long-term girlfriend of the Plaintiff. *Id.* at pp. 48–49.

3. The Plaintiff would likely be unable to claim his daughter as a dependent. *Id.* at p. 58.

4. In January 2005, the Plaintiff enrolled at John Marshall Law School ("John Marshall"), where he received his J.D. in 2008. *Id.* at p. 37. He later received his L.L.M. from John Marshall in 2013. *Id.* at p. 41.

5. The Plaintiff passed the Illinois bar exam in 2008. *Id.* at 38. He is currently in good standing to practice law in Illinois. *Id.* at p. 102.

6. Since 2008, the Plaintiff has worked as a document review attorney on a contract-to-contract basis. PX No. 7; DX No. 1; Tr. at pp. 42–43.[8] He currently works for Haystack ID, a third-party document review service. Tr. at p. 42.

7. The Plaintiff applied for numerous positions towards the end of law school, after obtaining his J.D. and passing the bar and again after obtaining his L.L.M., but received no offers for full-time legal work and has only able to secure legal work on a contract basis as a document-review attorney. Tr. at pp. 38–41, 100–101; DX No. 16. In the four to five years before the Trial, the Plaintiff has not applied for any job or otherwise sought new employment, legal or otherwise, other than new projects as a contract attorney. Tr. at p. 54; *see also id.* at pp. 100–101.

8. On February 20, 2018, the Plaintiff filed for chapter 7 relief, thereby commencing the Main Case. Pet., at p. 1. On his Schedules, the Plaintiff listed the Department of Education, ECMC and Access as unsecured creditors. Scheds. E/F. As of the date

---

[7] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Decision.

[8] In this adversary proceeding, the Plaintiff submitted individual exhibits and the Answering Defendants submitted joint exhibits with consecutive number designations. *See* Joint Pretrial Stmt., at pp. 6–7. The court will use the designations PX and DX for the Plaintiff's exhibits and the Answering Defendants' joint exhibits, respectively.

of the Petition, the Plaintiff's total indebtedness was $373,240.00, all of which was unsecured. *Id.*

9. On May 25, 2018, the Plaintiff filed the Adversary Complaint to Determine the Dischargeability of Certain Debts [Adv. Dkt. No. 1], thereby initiating this adversary proceeding.

10. The Plaintiff received a discharge on May 30, 2018. Discharge Order, at p. 1.

B. The Student Loan Obligations

11. To finance his J.D. and L.L.M., the Plaintiff received student loans issued by the Department of Education, ECMC and Access (collectively, the "Student Loans" or the "Student Loan Obligations").

12. The Plaintiff is currently indebted on the Student Loans in the amount of $351,034.38.[9] Joint Pretrial Stmt., at pp. 2–5.

C. The Department of Education Loans

13. From September 9, 2009 to February 15, 2013, the Department of Education dispersed a total of 11 loans to the Plaintiff (the "Department of Education Loans"). Joint Pretrial Stmt., at pp. 2–3. The Department of Education Loans are comprised of two FFELP Stafford loans, two Direct Stafford loans and seven Direct Consolidation loans. *Id.*

14. Before filing for bankruptcy, the Plaintiff participated in the Income-Based Repayment Plan and the Revised Pay-As-You-Earn Plan offered by the Department of Education (collectively, the "Repayment Plans"). Joint Pretrial Stmt., at p. 3; DX Nos. 12, 13; Tr. at pp. 49–50.

15. On February 23, 2018, the Department of Education notified the Plaintiff that the Repayment Plans would require him to make monthly payments of $325.31 toward the Department of Education Loans. Joint Pretrial Stmt., at p. 3.

16. As of August 22, 2019, the Plaintiff's total indebtedness on the Department of Education Loans was $204,773.99. *Id.*

17. The Plaintiff testified that he has made some payments on the Department of Education Loans. Tr. at p. 50. The number and amounts of such payments, however, were not provided.

---

[9] This amount is more than what the Debtor testified to at the Trial. *See* Tr. at pp. 99–100 (testimony by the Debtor that his total student loan debt was $325,746.00 as indicated in his Schedules); *see also* Scheds. E/F. This discrepancy is immaterial to the court's analysis.

18. The Department of Education Loans are currently in forbearance due to the underlying bankruptcy case. Joint Pretrial Stmt., at p. 3.

D. The ECMC Loans

19. ECMC is a non-profit agency that guarantees Stafford loans issued by the Department of Education. Joint Pretrial Stmt., at p. 4.

20. From August 7, 2006 to January 8, 2007, ECMC dispersed two Stafford loans to the Plaintiff (the "ECMC Loans"). Joint Pretrial Stmt., at pp. 3–4.

21. As of August 22, 2019, the Plaintiff's total indebtedness on the ECMC Loans was $18,500.00. *Id.*

22. The Plaintiff has not made any payments on the ECMC Loans. Joint Pretrial Stmt., at pp. 3–4; Tr. at pp. 95–96.

E. The Access Loans

23. Access is a private student loan lender who dispersed four student loans to the Plaintiff (the "Access Loans"). Joint Pretrial Stmt., at p. 4.

24. As of August 22, 2019, the Plaintiff's total indebtedness on the Access Loans was $127,760.39. *Id.* at p. 5.

25. The Plaintiff's total monthly payments on the Access Loans are $737.00. *Id.*

26. The Plaintiff has not made any payments on the Access Loans. *Id.*

F. The Plaintiff's Income and Expenses

27. The Plaintiff's current sole source of income is from his job at Haystack. *See* Sched. I.

28. Over the past five years, the Plaintiff has gradually increased his income. Tr. at pp. 44–45. In 2014, the Plaintiff earned a gross income of $50,849.00. PX No. 2; Tr. at p. 44. By 2018, the Plaintiff's gross income had increased to $60,969.00. PX No. 2; Tr. at p. 44. The Plaintiff expects to earn approximately $60,000.00 in 2019. Tr. at pp. 45, 53.

29. The Plaintiff spends approximately $500.00 per month on food. Sched. J.

30. The Plaintiff spends approximately $400.00 per month on health insurance. Sched. J; Tr. at p. 45.

31. The Plaintiff currently has no housing costs. Prior to his lease expiring in July 2019, the Plaintiff had been making rent payments at $1,096.00 per month. Tr. at pp. 62–63.

32. Since receiving his discharge, the Plaintiff has been making the following two additional monthly expenses not reflected in Schedules I and J:

   a. The Plaintiff currently provides approximately $500.00 per month in child support to Palmer pursuant to a voluntary arrangement between the couple. The Plaintiff and Palmer determined such amount by utilizing an online child support estimation calculator provided by the State of Illinois. Tr. at pp. 59–61.

   b. The Plaintiff also provides $950.00 per month for his daughter to attend daycare. *Id.*

33. The Plaintiff currently spends approximately $84.00 per month on cable streaming services. *Id.* at 64–65.

34. From October 2018 to November 2018, the Plaintiff traveled out-of-state to attend two concerts, where he spent approximately $506.60 for lodging and undetermined amounts on airfare and concert tickets. Tr. at pp. 66–68; DX No. 9.

35. From November 20, 2018 to May 16, 2019, the Plaintiff made a total of $2,445.00, or an average of $407.50 per month, in ATM withdrawals. Tr. at pp. 72–91; DX Nos. 4–10. The Plaintiff testified that while he does "not generally" keep track of these cash purchases, they sometimes would be used for entertainment or recreational purposes. Tr. at pp. 73–74.

## CONCLUSIONS OF LAW

Section 523 enumerates specific, limited exceptions to the dischargeability of debts. *See generally* 11 U.S.C. § 523(a). Student loan debts are subject to one such exception and are presumptively nondischargeable in bankruptcy. 11 U.S.C. § 523(a)(8); *see, e.g., In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005). However, a debtor may rebut this presumption by proving that excepting such debt from discharge would impose an "undue hardship" on the debtor. 11 U.S.C. § 523(a)(8). The undue hardship exception is found in section 523(a)(8), which in relevant part provides:

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt—

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)(1) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by any governmental unit or nonprofit institution . . . .

11 U.S.C. § 523(a)(8).

Section 523(a)(8) creates a presumption that student loans are nondischargeable, and the burden of challenging this presumption rests upon the debtor. *United States v. Wood*, 925 F.2d 1580,

8

1583 (7th Cir. 1991). Accordingly, a debtor must file an adversary proceeding against those creditors holding her student loan debt in order to show that the debt should be discharged. *Clark v. U.S. Dep't of Educ. (In re Clark)*, 341 B.R. 238, 248 (Bankr. N.D. Ill. 2006) (Squires, J.) (*citing Hanson*, 397 F.3d at 484); *see also Wood*, 925 F.2d at 1583 ("[T]he statute was meant to be self-executing so that the creditor would not be required to file a complaint to determine the dischargeability of a student loan.").

"Undue hardship" is not defined in the Bankruptcy Code. The Seventh Circuit has adopted the well-known test for determining undue hardship first set forth by the Second Circuit in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987). *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993). Under the so-called *Brunner* test, an undue hardship exists where a debtor can establish the following three elements:

(1) The debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans;

(2) Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loans; and

(3) The debtor has made good-faith efforts to repay the loans.

*O'Hearn v. Educ. Mgmt. Credit Corp. (In re O'Hearn)*, 339 F.3d 559, 563 (7th Cir. 2003) (*citing Roberson*, 999 F.2d at 1135). The burden of proof is by the preponderance of the evidence. *Id.* at 565.

The Complaint, therefore, cannot succeed unless the Plaintiff establishes each element of the *Brunner* test by a preponderance of the evidence. Should the Plaintiff fail on any one element, the inquiry is at its end and the court must deny a discharge of the Student Loans.

The court will consider each element in turn.

A. <u>Minimal Standard of Living</u>

The first prong of the *Brunner* test requires the Plaintiff to show that he would be unable to maintain a minimal standard of living for himself and his dependents at present if forced to repay his student debt. *Roberson*, 999 F.2d at 1135. The court must determine whether repaying the loans now "would cause [the debtor's] standard of living to fall below that minimally necessary." *Clark*, 341 B.R. at 249 (*quoting O'Hearn*, 399 F.3d at 564) (internal quotation marks omitted). This element requires showing "more than simply tight finances." *Kehler v. Nelnet Loan Servs. (In re Kehler)*, 326 B.R. 142, 147 (Bankr. N.D. Ind. 2005) (*citing Penn. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009 (1996)). The court must examine a debtor's current monthly income and necessary expenses while also disregarding any unnecessary or unreasonable expenses that could be used instead to reduce the student loan debt. *See, e.g., Clark*, 341 B.R. at 249.

To satisfy the first element, a debtor has the burden to show that he has minimized his expenses and maximized his income. *Murrell v. Edsouth (In re Murrell)*, 605 B.R. 464, 470 (Bankr. N.D. Ohio 2019). Turning first to the former, the Plaintiff has not minimized his expenses. The Plaintiff routinely spends hundreds of dollars per month on discretionary expenses for

9

entertainment or recreational purposes, such as concert tickets, related travel expenses and regularly dining out. Tr. at pp. 66–68, 72–91; *see also* DX Nos. 4–5, 9. Such expenses include the regular, large ATM withdrawals of cash that the Plaintiff does not track or account for and uses for unknown, but likely recreational, purposes. Tr. at pp. 72–91. Similarly, the Plaintiff has spent $84.00 per month on multiple television and streaming services. Tr. at pp. 59–61; Scheds. I, J. Unexplained, generic expenditures combined with excessive entertainment or other unnecessary expenses show that "the Debtor does not lead a frugal lifestyle and that [he] spends improvidently." *Clark*, 341 B.R. at 150. While a debtor "does not have to 'live in abject poverty[,]'" *id.* at 249 (*quoting Faish*, 72 F.3d at 305), a debtor is nevertheless expected to make some sacrifices and "live within the strictures of a frugal budget for the foreseeable future." *Id.* (*citing Ritchie v. Nw. Educ. Loan Ass'n (In re Ritchie)*, 254 B.R. 913, 917–18 (Bankr. D. Idaho 2000)); *see also Kehler*, 326 B.R. at 147 (a debtor cannot succeed under the first prong by demonstrating the repayment of student debt would require major personal and financial sacrifices). The Plaintiff has not met his burden to show that repayment of the Student Loan Obligations would necessitate major personal and financial sacrifices on his part or that he has attempted to minimize his expenses.

In addition, some courts have looked at the national poverty guidelines as a measure to determine what constitutes a minimum standard of living for purposes of this first element. *See, e.g., Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 28 (Bankr. D. Conn. 1999) (holding that the analysis "begins, and ends," when the debtor earned over twice the federal poverty guidelines); *Hart v. Educ. Credit Mgmt. Assoc. (In re Hart)*, 438 B.R. 406, 412 (E.D. Mich. 2010) (recognizing same). Given the amount of debt at issue here, however, this approach seems excessively harsh. This approach has not been adopted by courts in this jurisdiction, and the court declines to adopt it here. Nonetheless, it is worth noting at the outset that the Plaintiff earns almost five times the amount applicable under the federal poverty guidelines. *See* Annual Update of the HHS Poverty Guidelines, 84 Fed. Reg. 1167, 1168 (Feb. 1, 2019) (stating that the poverty guideline for annual income for a one-person household is $12,490.00).

Next, the Plaintiff has also failed to show that he has maximized his income or that he has made significant efforts to maximize his income. *See Murrell*, 605 B.R. at 470. While the Plaintiff has been working as a contract attorney on a project-by-project basis, his income has increased on an annual basis since 2014, from approximately $51,000.00 in 2014 to approximately $61,000.00 in 2018. Tr. at pp. 44–45, 53. The Plaintiff however is a well-educated individual with a J.D. and L.L.M. who has been practicing law for over ten years. Tr. at pp. 37–43, 102. Nevertheless, he has not applied for any new positions, other than new projects as a contract attorney, in the past four to five years, a period which begins only shortly after the Plaintiff obtained his L.L.M. Tr. at pp. 38–43, 54, 100–101. In the absence of efforts to secure a higher-paying position, whether as an attorney or otherwise, and given the lack of other evidence regarding efforts to increase his income, the Plaintiff has failed to demonstrate that he has maximized or attempted to maximize his income.

In light of the foregoing, the Plaintiff has failed to show that he could not maintain a minimal standard of living if forced to repay the Student Loans and has, therefore, failed to meet his burden under the first prong. Such failure to succeed on the first element of the *Brunner* test, without more, means that the Student Loans cannot be discharged.

B.     <u>Additional Circumstances Indicating That the Present State of Affairs Is Likely to Persist for a Significant Portion of the Repayment Period of the Student Loans</u>

While the Plaintiff's failure to meet his burden with regards to the first prong alone renders the Student Loan Obligations nondischargeable, an examination of the remaining two prongs leads to the same result. The Plaintiff, for similar reasons applicable under the first prong, failed to meet his burden on the second and third prongs.

The second element of the *Brunner* test requires evidence "not only of a current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time . . . ." *Roberson*, 999 F.2d at 1136 (*citing Brunner*, 831 F.2d at 396). Historically, case law concerning the second element required a showing of circumstances that suggest a "certainty of hopelessness" that a debtor would be able to repay her debts, *e.g. Roberson*, 999 F.2d at 1135, a standard that grew to become more restrictive than the statutory text itself. The Seventh Circuit has since directed our courts "not to allow judicial glosses, such as the language in *Roberson* and *Brunner*, to supersede the statute itself." *Tetzlaff v. Educ. Credit Mgmt. Corp. (In re Tetzlaff)*, 794 F.3d 756, 759–60 (7th Cir. 2015). Nonetheless, a debtor still must demonstrate that her present inability to repay the loans while maintain a minimal standard of living is likely to continue for a large portion of the repayment period based on the existence of additional circumstances, beyond the terms of the loans themselves. *Id.* at 759–60; *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, at 884–85 (7th Cir. 2013). Examples of such additional circumstances provided by the Seventh Circuit include "psychiatric problems, lack of useable job skills and severely limited education." *Goulet v. Educ. Credit Mgmt. Corp. (In re Goulet)*, 284 F.3d 773, 778 (7th Cir. 2002) (*citing Roberson*, 999 F.2d at 1137).

The Plaintiff has failed to demonstrate the existence of additional circumstances indicating that a present inability to repay the Student Loans will persist for a significant portion of the repayment period. The Plaintiff argued at the Trial and in his briefing that his inability to obtain any employment with better pay, the increased expenses due to the recent birth of his child and his age satisfy the second prong. Tr. at pp. 21–22, 115–16; Pl.'s Pretrial Br., at pp. 7–9. As discussed above, while the Plaintiff was only able to obtain legal employment as a contract attorney after obtaining his J.D. and L.L.M., the Plaintiff has not attempted to obtain any new employment in at least four years. *See* Tr. at pp. 38–41, 100–101. While it is true that some combination of a poor job market, a lack of education or qualifications, an inability to move to an area with more economic opportunity or take other steps to improve employment prospects and a history of subpar or no employment may suffice under the second prong, *Krieger*, 713 F.3d at 884–85 (debtor satisfied the second prong by showing: years of unemployment despite relatively consistent efforts to find work; her limited work experience and education; a poor job market; and her inability to relocate or pursue further education), the Plaintiff comes far short of meeting his burden here.

The Plaintiff testified that he performed poorly in law school, both while obtaining his J.D. and his L.L.M., Tr. at pp. 36–41, which may in part explain his inability to obtain full-time legal work in the period from 2008 to 2013. The Plaintiff, however, presented no other evidence regarding any circumstances underlying his inability to advance his career or his continued employment as a contract attorney over the past ten years or indicating that such inability is likely to continue. The only evidence that explains the Plaintiff's inability to secure better employment, at least in the four to five years before trial, is the Plaintiff's testimony that he has not attempted to apply for any other positions during such period. Tr. at p. 54.

11

Nor did the Plaintiff present evidence of any other additional circumstances impeding his ability to repay the Student Loans other than the recent birth of his child and his age. Courts regularly consider the existence of one or more dependents or non-dependent children, as well as a debtor's overall personal and familial circumstances, in conducting the analysis required under the second prong of the *Brunner* test. However, while the overall costs of raising a child can be high, absent more, the mere fact that a debtor is a father or mother will not by itself suffice to satisfy the *Brunner* test. *See, e.g., Walker v. Sallie Mae Serv. Corp. (In re Walker)*, 650 F.3d 1227, 1229–30, 1234–35 (8th Cir. 2011) (first and second prong satisfied in part by high costs associated with long-term care of debtor's autistic twins who required, and would for the foreseeable future require, extensive in-home therapy and other related care); *Tuttle v. Educ. Credit Mgmt. Corp. (In re Tuttle)*, 600 B.R. 783, 801–03 (Bankr. E.D. Wisc. 2019) (debtor with some education and work experience and an educated and employed wife, who served as the primary source of income for the family while the debtor had been a stay-at-home father, did not meet the second prong); *Goodman v. U.S. Dep't of Educ. (In re Goodman)*, 499 B.R. 287, 294–95 (Bankr. N.D. Ohio 2011) (the existence of seven dependent children was sufficient for the first prong but not the second, because such children would all reach the age of majority well before the end of repayment period of the student loans).

Here, while the Plaintiff has no dependents, he has a six-month-old child who resides with his long-term girlfriend, Palmer. *See* Tr. at pp. 34, 48–49, 58. The Plaintiff contributes approximately $500.00 per month towards supporting the child generally and another $950.00 per month towards the child's daycare. *Id.* at pp. 59–61. The Plaintiff did not testify as to the details of Palmer's financial situation, but she is well employed and owns the residence where the child resides. Tr. at p. 52. The Plaintiff presented no evidence regarding heightened or unusually-high costs associated with the care of his child or his family situation, such as, for example, the existence of numerous dependents or dependents who require special care or a lack of familial or other like support. *Cf. Walker*, 650 F.3d at 1234–35; *Goodman*, 499 B.R. at 294–95. Moreover, the Plaintiff and Palmer are raising the child together, including sharing the associated financial burdens, and Palmer's own financial situation appears to be stable. *See* Tr. at pp. 52, 59–61.

Finally, the Plaintiff's age and the possibility that the Plaintiff might not live to the end of the term of the Student Loans are not "dispositive factor[s]" under the second *Brunner* prong. *See Bukovics v. Navient (In re Bukovics)*, 587 B.R. 695, 707 (Bankr. N.D. Ill. 2018) (Schmetterer, J.) (*quoting Cavender v. Nat'l College of Naprapathic Medicine (In re Cavender)*, Case No. 16ap00657, 2017 WL 8218841, at *7 (Bankr. N.D. Ill. Nov. 27, 2017) (Hunt, J.)). The Plaintiff here is 41 years old and has at least two decades, if not longer, to continue to earn income before any potential retirement. Tr. at pp. 62–63; *see Bukovics*, 587 B.R. at 707 (second prong was not met as to a healthy 51-year-old debtor with a college degree and history of employment); *Cavendar*, 2017 WL 8218841, at *7 (second prong not met as to a healthy, well-educated 67-year-old with earning potential).

Overall, the Plaintiff here resembles the debtors in *Tetzlaff* and *Tuttle*, who both had an education and work experience, and were not faced with any extraordinary or unusual circumstances hindering their ability to obtain a job, or a higher-paying job, or otherwise improve their overall financial situation. *See Tetzlaff*, 794 F.3d at 759 (second prong was not met where the debtor was a smart individual with an advanced degree who was able to earn a living despite some psychological issues that were not severe); *Tuttle*, 600 B.R. at 801–03 (second prong not met where a debtor with multiple dependent children had advanced degrees, a history of employment, access to a good job market and a wife with her own advanced degree and a high earning capacity). As in those cases, the Plaintiff has failed to demonstrate the existence of additional circumstances indicating that the

Plaintiff will likely be unable to repay the Student Loans for a significant portion of the repayment period and has, therefore, failed to satisfy the second prong of the *Brunner* test.

C.   Good Faith Effort to Repay

The final prong under *Brunner* requires a debtor to establish that he "made good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1136. Good faith may be found where a debtor has consistently made at least some payments on the student loans in the past, has sought consolidation or forbearance, has made other efforts to increase affordability of the loan payments or has offered to compromise or settle the obligation in a meaningful manner. *Tetzlaff*, 794 F.3d at 760–61; *Straub v. Sallie Mae Educ. Credit Mgmt. Corp. (In re Straub)*, 435 B.R. 312, 317 (Bankr. D.S.C. 2010). A debtor's efforts to "obtain employment, maximize income, and minimize expense" are also relevant to determining whether a debtor has made good faith efforts to repay student loans. *Roberson*, 999 F.2d at 1136.

Here, the Plaintiff argues that an unspecified number of amount of payments he has made on the Department of Education Loans, coupled with his participation in the Repayment Plans, show that he has made a good faith effort to repay the Student Loans. Tr. at pp. 22–23, 115–16; Pl.'s Pretrial Br., at pp. 9–10. The Plaintiff failed to offer any testimony about the frequency or extent of such payments and without such information, the court cannot conclude, even with participation in the Repayment Plans, that the Plaintiff has made a good faith effort to repay the Department of Education Loans.

Further, the Plaintiff has yet to make *any* payments on either the ECMC Loans or the Access Loans or take any other meaningful steps towards satisfying his obligations thereon. Tr. at pp. 95–96, 101; Joint Pretrial Stmt., at pp. 3–4. While the failure to make at least some payment toward student loans does not automatically equate to a lack of good faith, *Bard-Prinzing v. Higher Educ. Assistance Foundation (In re Bard-Prinzing)*, 311 B.R. 219, 228 (Bankr. N.D. Ill. 2004) (Schmetterer, J.), the Plaintiff offered no explanation for his failure to make any payments on the ECMC Loans or the Access Loans. Further, while the Plaintiff apparently investigated some repayment options for the ECMC Loans and Access Loans, he never actually applied or sought to consolidate such loans or enroll in any repayment plan with respect to such loans. Tr. at pp. 50, 95–96, 101. While the Plaintiff is not required to consolidate or to enroll in repayment plans, the lack of such efforts combined with the lack of any payments on the ECMC Loans and Access Loans weighs against a finding of good faith efforts to repay. *See, e.g., Thoms v. Educ. Credit Mgmt. Corp. (In re Thoms)*, 257 B.R. 144, 149–50 (Bankr. S.D.N.Y. 2001). The fact that the Plaintiff has made some payments on the Department of Education Loans cannot serve to demonstrate good faith efforts to repay the remaining loans. *Tetzlaff*, 794 F.3d at 761.

Finally, as has already been discussed more fully above, the Plaintiff has not maximized his income or minimized his expenses and has not sought new or better employment in the four to five years before the Trial, all of which also counsels against a finding of good faith efforts to repay all of the Student Loans.

Accordingly, the Plaintiff has also failed to demonstrate that he has made good faith efforts to repay the Student Loans and has therefore failed on the third *Brunner* prong.

13

## CONCLUSION

For the foregoing reasons the court finds that the Plaintiff has failed to carry his burden under section 523(a)(8). As a result, judgment in favor of the Answering Defendants will be rendered on the Count II of the Complaint and the Student Loan Obligations remain nondischargeable.

Dated: December 5, 2019

ENTERED:

_____
Timothy A. Barnes
United States Bankruptcy Judge